## 524

Lloyd E. PROSCH and Virginia Prosch, his wife, and the Continental Insurance Companies, Plaintiffs,

v.

Eaton YALE and Towne Inc., formerly known as Yale and Towne Company, Defendant.

Civ. A. No. 29795.

United States District Court
E. D. Michigan, S. D.

Nov. 12, 1969.

Leo James, Southfield, Mich., for plaintiffs.

1. Defendant Eaton's attempt to retain in the case as third-party the Fall River Foundry, manufacturer of the housing utilized by Eaton, was defeated upon Fall River's motion, prior to this decision. Whether the accrual of the prin-

Buell Doelle, Detroit, Mich., for defendant.

OPINION

TALBOT SMITH, District Judge.

This is an action for personal injuries, a products liability case. Plaintiff Prosch has sued the manufacturer of an allegedly defective "chain fall" which figured in the injury.[1]

The question before us is the meaning of a statute purporting to govern the accrual of a cause of action for personal injuries. It reads in part as follows:

"600.5805 Injuries to person or property.

"No person may bring or maintain any action to recover damages for injuries to persons or property unless, after the claim first accrued to himself or to someone through whom he claims, he commences the action within the periods of time prescribed by this section.

"(1) The period of limitations is 2 years for actions charging assault, battery, and false imprisonment.

\* \* \* \* \* \*

"(3) The period of limitations is 2 years for actions charging malpractice.

\* \* \* \* \* \*

"(6) The period of limitations is 1 year for actions charging libel or slander.

"(7) The period of limitations is 3 years for all other actions to recover damages for injuries to persons and property."

As to the time "the claim first accrued," Mich.Comp.Laws, Section 600.-5827 provides as follows:

"\* \* \* the claim accrues at the time the wrong upon which the claim

cipal cause of action was triggered by the sale of the product or by the accident, Fall River's liability on an asserted warranty theory was foreclosed by the running of the statute of limitations as to it.

is based was done regardless of the time when damage results."

The obscure and unfortunate wording of this latter section, and its even deeper apparent obscurity of intent, have provoked marked disagreements both at the bench and bar of this state. There is no decision of our state Supreme Court directly in point. We will proceed on the basis of what we have.

It is argued, on the one hand, that the statute "means exactly what it says", which somewhat begs the question. More specifically, and in the context of the case before us, it means that when the predecessor of defendant Eaton, Yale & Towne put on the market this allegedly defective article, some six years ago, the plaintiff's cause of action accrued, although at that time the plaintiff, for all that appears in the pleadings, was a complete stranger to the article and its sale. Three years from such date, it is said, plaintiff's action was barred. As to such time, it is not asserted that plaintiff had even seen the article, much less used or possessed it. In support of this position it is argued that the statute is one of repose, and that it was the intent of the legislature to free from liability all manufacturers whose products cause injury long after their entry into the mainstream of commerce and the commencement of their use.

On the other hand it is urged to us that such an interpretation of the statute is little short of ridiculous. It means, it is said, that a person having suffered, for instance, an injury from a defective lawn mower, can have lost his cause of action even before he was born. If the manufacturer's argument is valid, this is true.

There is little to be gained from a dissection of particular cases from other jurisdictions. The statutes vary widely in phraseology and as one plows through the intricacies of pleading and theory, as warranties both express and implied are interwoven with negligence to reach what modern law now recognizes as a just result, Lord Abinger comes inevitably to mind. In one respect, at least, he was prescient. In the case of Winterbottom v. Wright, 10 M. & W. 109, 152 Eng.Rep. 402 (1842) he observed that " 'the most absurd and outrageous consequences to which I can see no limit, would ensue' if it should ever be held that one party to a contract was under any obligation to anyone but his immediate promise." [2]

The statutory disparities in cases from the various jurisdictions combined with the disparity of views held by able counsel, and judges, in our own jurisdiction (this is a diversity matter) compel our return to basic principles of tort law. The confusion that has arisen comes from a too hasty reading of the applicable precedents and reliance upon precedents inapposite to the tort under examination. The felicitous phrase as to some unrelated tort becomes by easy adoption first a rule of law, then an axiom, governing a situation far from the mind of him who coined. We have become semantic prisoners. Our keep is the dictionary, not the ideal of justice. It is only thus that it could be argued that a cause of action was barred by limitations before it arose, that the child was buried before he was born, and that long before the bride entered upon her holy state, she had been divorced.

In this welter of minutae we turn principally to Cooley and Cardozo for analysis. The key word before us is the word "wrong". This is the time the claim accrues, namely, "at the time the wrong upon which the claim is based was done". This word, wrong, is a word of infinite meaning. It is a wrong when junior swipes his sister's doll, when derogatory idle gossip is repeated, when a public officer so acting degrades a citizen, or when one brutally attacks another. A less fortunate choice of word for triggering the running of the cause of action could hardly have been made.

2. Prosser in Palsgraf Revisited, 52 Mich.L.R. 1, 13 (1953).

Cooley addresses himself to the word in these terms:[3]

> "Concurrence of Wrong and Damage. It is said by the authorities that it is the conjunction of damage and wrong that creates a tort, and there is no tort if either damage or wrong is wanting. Here the word 'wrong' is used in the sense of a thing amiss; something which for any reason the party ought not to do or to permit, and which does not become the actionable wrong called a tort unless the other element is found in the same case, namely, a damage suffered in consequence of the thing amiss. In this sense we shall frequently be compelled to make use of the word 'wrong', although it may sometimes be confusing to do so. This is one of the inconveniences which follow from employing a word which signifies a quality to designate a class of cases in which, in its ordinary sense, it is only an element, while it is equally applicable to numerous other cases which are not so classed."

The distinguished jurist then goes on to discuss those tortious acts with respect to which "damage [is] merely implied or presumed; not damage shown", together with a discussion of the need for the presumption of damage in such cases, concluding with those cases ["a very large proportion"] where "the wrong is only complete when damage is suffered."

It remained for Mr. Justice Cardozo (then Judge Cardozo) to make the most effective exposition of the "wrong" concept with relation to the negligence action. This he accomplished in the celebrated *Palsgraf* case.[4] In it the word "wrong" is thus analyzed:

> "The argument for the plaintiff is built upon the shifting meanings of such words as 'wrong' and 'wrongful', and shares their instability. What the plaintiff must show is 'a wrong' to herself, i. e., a violation of her own right, and not merely a wrong to someone else, nor conduct 'wrongful' because unsocial, but not 'a wrong' to any one. We are told that one who drives at reckless speed through a crowded city street is guilty of a negligent act and therefore of a wrongful one, irrespective of the consequences. Negligent the act is, and wrongful in the sense that it is unsocial, but wrongful and unsocial in relation to other travelers, only because the eye of vigilance perceives the risk of damage. If the same act were to be committed on a speedway or a race course, it would lose its wrongful quality."

The decision went on to point out, in words peculiarly appropriate to the plaintiff before us, that

> "Negligence, like risk, is thus a term of relation. Negligence in the abstract, apart from things related, is surely not a tort, if indeed it is understandable at all. Bowen, L.J., in Thomas v. Quartermaine, supra. Negligence is not a tort unless it results in the commission of a wrong, and the commission of a wrong imports the violation of a right, in this case, we are told, the right to be protected against interference with one's bodily security."

So it is in the case before us. Negligence involves a relationship. Without that relationship, there is no tort. The tort we have under consideration involves interference with one's bodily security. Historically, it grew out of the action on the case. Thus under the gravamen of the pleadings before us there was no tort, no wrong (to use the words of the statute) until bodily security had been invaded.

This is not to say that enactment of the statute was an exercise in futility. Torts (like the word wrong) are infinite in their variety. We have not only the torts involving bodily security, but we have the more sophisticated and subtle torts, such as conspiring to

---

3. Cooley on Torts, 4th Ed., ¶ 46.

4. Palsgraf v. Long Island R. Co., 248 N.Y. 329, 162 N.E. 99, 59 A.L.R. 1253 (1928).

deprive one of property by maintenance of suits resulting in void judgments, Rippe v. Sutter, 292 S.W.2d 86 (Mo. 1956), or the deliberate misrepresentation to another of the mineral potential of property, Kaufman v. C. R. A., Inc., 243 F.Supp. 721 (D.C.Mo.1965). We have, as well, the business torts, involving alleged tortious conduct on the part of directors or controlling stockholders. It is in such cases that the statute finds a peculiar applicability. Possibly years subsequent to some crucial (and assertedly tortious) business decision, economic conditions having changed, and memories weakened, substantial alleged damages may be felt. It is clear, in such cases, that the statute is not deferred in its running until all subsequent and consequential damages result. Nolen v. Shaw-Walker, et al. Civil 29094; Nolen v. Scudder, et al. Civil 30744. In each case we must look at the legal injury, the harm, the "wrong", involved. From such date the statute runs and not from the date of subsequent and consequent damages. This is what the statute means when it says that, regardless of the time when damage results, the claim accrues when the wrong was done. But what kind of wrong? That question cannot be answered in the abstract. This is where our prior reference to the infinite number of tort actions has great significance. We cannot cite the running in one case for that in another merely because each is a tort. The point is that each has its own characteristics of wrong and damage. See Cooley, *supra*.

An excellent illustration hereof is Kennedy v. Local 38, 3 Mich.App. 700, 143 N.W.2d 596 (1966), discussed in our ruling in Nolen v. Shaw-Walker, *supra*. Here when the plaintiff temporarily left the industry he took out a withdrawal card which had the effect of terminating his rights under a retirement plan. The financial effect ("substantial damages") was felt years later. The Court held that "the loss of such right was an injury to plaintiff in October, 1952. It was a sufficient invasion of plaintiff's rights, if occasioned by defendants' negligent breach of duty, to commence the running of the statute of limitations. The fact that plaintiff felt no substantial damages until he actually received his retirement benefits in February, 1965, is not material".

So interpreted the statute is meaningful, though whether beneficial or harmful may be a matter of argument. But under no interpretation can it be held that a statute which on its face purports only to put a time limit on the assertion of certain causes of action can be used effectively to prevent the assertion of a cause of action for personal injury which has never historically been held to exist prior to such injury. It is a statute of limitations, not of abolition. If the legislature had intended to so insulate manufacturers from long-term liability, which, we would be the first to concede has from the commercial point of view ample justification, the means and words chosen could have adequately expressed such purpose. See, for example, Section 47 of the Michigan Corporation Act, limiting directors' liability, and the interpretation thereof by Mr. Justice Souris in Detroit Gray Iron and Steel Foundries, Inc. v. Martin, 362 Mich. 205, 211, 106 N.W.2d 793 (1961).

We return to our starting point: the word "wrong" is the key. In personal injury actions arising out of negligence we have no "wrong" until plaintiff shows a violation of his right to bodily security. This interpretation is consonant with the purpose of a statute of "limitations". Otherwise construed, the statute does not merely limit the bringing of a cause of action that has at one time accrued, which is the purpose of limitations. It simply abolishes the cause of action. Such a construction is completely inconsistent with applicable precedent, it postulates an absurdity, namely, that an event is over before it happens, and, moreover, attributes to our great coordinate branch of government, the legislature, an intent at variance with known benign and humanitarian public acts.